AO 91 (Rev. 11/11)  Criminal Complaint

SEALED BY ORDER OF COURT

E-filing

FILED
OCT 27 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| SUNITHA GUNTIPALLY, VENKAT GUNTIPALLY, PRATAP "BOB" KONDAMOORI, and SANDHYA RAMIREDDI | ) |
| | ) **14  71358**  MAG |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____See Complaint Attachment____ in the county of ____Santa Clara____ in the

____Northern____ District of ____California____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 371 | Conspiracy to commit offenses against the United States, as described in Complaint Attachment |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Richard Lin, Special Agent, DHS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____10/27/14____

_____
*Judge's signature*

City and state: ____San Jose, CA____

Hon. Howard R. Lloyd, U.S. Magistrate Judge
*Printed name and title*

<u>Complaint Attachment</u>

From in or about April of 2013 to at least in or about April of 2014, in Santa Clara County and elsewhere, in the Northern District of California and elsewhere, defendants SUNITHA GUNTIPALLY, VENKAT GUNTIPALLY, PRATAP "BOB" KONDAMOORI, and SANDHYA RAMIREDDI did knowingly and intentionally conspire to commit offenses against the United States as follows:

> to knowing make under oath, and cause to be made, and to subscribe as true under penalty of perjury under 28 U.S.C. § 1746, and cause to be so subscribed, false statements with respect to material facts in an application, an affidavit, and a document required by the immigration laws and regulations prescribed thereunder, namely in I-129 petitions, and supporting documentation for applicants attached to those I-129 petitions, which petitions and documentation falsely represented that certain non-immigrant worker applicants had job offers from an American employer identified as Traction HQ, when the defendants knew that these representations were false, in violation of Title 18, United States Code, Section 1546(a);

and in furtherance of that conspiracy, and to effect the objects thereof, on or about April 8, 2013, defendants filed, and caused to be filed, the fraudulent I-129 petition for "S.P.N.;" all in violation of Title 18, United States Code, Section 371.

**AFFIDAVIT OF SPECIAL AGENT RICHARD LIN IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS FOR MULTIPLE DEFENDANTS**

I, Richard Lin, being duly sworn, depose and state as follows:

## I.     INTRODUCTION

1. This Affidavit is submitted in support of criminal complaints and arrest warrants concerning violations of Title 18 U.S.C. § 1546 (Fraud and Misuse of Visas, Permits and Other Documents), Title 18 U.S.C. § 1001 (False Statements), Title 18 U.S.C. § 371 (Conspiracy), Title 18 U.S.C. § 1343 (Wire Fraud), and Title 18 U.S.C. § 1956 (Money Laundering) by Venkat GUNTIPALLY ("Venkat"), Sunitha GUNTIPALLY ("Sunitha"), Sandhya RAMIREDDI ("RAMIREDDI"), and Pratap KONDAMOORI ("KONDAMOORI").

2. Based on my training, experience, and investigation to date, there is probable cause to believe the four individuals identified above have committed violations of federal statutes including conspiracy in violation of Title 18, United States Code, Section 371, as described in the complaint.

3. In sum, DS Soft Tech and Equinett (hereinafter **"Subject Companies"**) as well as an additional subject of the investigation, **SISL Networks**, provide information technology services to various Fortune 500 and other corporate clients, largely by obtaining specialty occupation ("H-1B") work visas for and placing high-technology workers from India at the corporate clients. **Subject Companies**, through their corporate officers, Venkat GUNTIPALLY (President) and Sunitha GUNTIPALLY (Vice-President), along with Sandhya RAMIREDDI (**Subject Companies'** and **SISL Networks'** HR/Operations Manager) have conspired with Bob KONDAMOORI, President of **SISL Networks,** in a visa fraud scheme.  These individuals, through the **Subject Companies** and **SISL Networks** and other entities, have been fraudulently obtaining H-1B visas from the

1

Department of Homeland Security (DHS), as described further below. The fraudulent scheme entails, in substance, the submission of false documentation in support of H-1B visa applications to DHS, thereby fraudulently inducing DHS to issue the H-1B work visas to **Subject Companies'** and **SISL Networks'** foreign workers. However, DHS would not have issued the H-1B visas if it had known at the time of various visa applications that the supporting documentation submitted by **Subject Companies** and **SISL Networks** was false.

4. Although DS Soft Tech and Equinett are technically separate companies, they operate identically, using the same corporate officers, and business model. Referred to as "sister" companies in the vernacular of the IT recruiting world and by Sunitha GUNTIPALLY herself, petitioning companies such as **Subject Companies** often divide their operations among multiple corporate identities in an attempt to avoid being labeled as "H-1B dependent" by USCIS. H-1B dependent companies are ones that employ more than 25 H-1B employees and as such are required to pay an additional $750 in fees due to the American Competiveness and Workforce Improvement Act.

5. The facts set forth in this Affidavit are known to me as a result of my participation in this investigation, from information provided to me by other law enforcement officers and from records, documents, and other evidence obtained during this investigation. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested complaint and arrest warrants, I have not included each and every fact known to me concerning this investigation, but rather those facts which I believe are necessary to establish probable cause to charge and arrest these individuals. Everything set forth in this Affidavit is true to the best of my knowledge and belief.

## II.   AFFIANT BACKGROUND

6. I am a Special Agent of the Diplomatic Security Service, which is an agency of the United States State Department and I have been so employed for over 12 years. I am presently assigned to the Document and Benefit Fraud Task Force at DHS. This task force investigates sophisticated immigration frauds in the San Francisco Bay Area, and as such, I have received and continue to receive specialized training and instruction from State Department officers who issue entry visas to foreigners overseas and DHS officers who issue employment documents to foreigners already inside of the United States. I am empowered under 22 U.S.C. § 2709 to investigate visa frauds, as well as to apply for and serve federal arrest and search warrants. My previous assignments with DSS include New York, Washington, D.C., Karachi, Pakistan, Beirut, Lebanon, and Los Angeles, along with numerous long-term temporary duty assignments to locales throughout the Middle East.

## III.   SPECIALTY OCCUPATION H-1B WORK VISAS

### A.   H-1B Work Visa

7. Foreigners wishing to work in the United States must apply for a work visa through DHS which include in pertinent part, H-1B specialty occupation work visas. H-1B visas are reserved for specialty occupation foreign workers, namely computer programmers, scientists, and engineers who hold at least a bachelor's degree. H-1B visas were designed so industries could fill skill and labor gaps with foreign workers. They have strict issuance requirements, lengthy processing times, fees, wage and labor promises, certifications, and quotas.

### B.   Labor Condition Application (LCA)

8. If a U.S. company wishes to sponsor a foreign special occupation worker on an H-1B visa, the U.S. company, acting as a Petitioner, begins the process by submitting a Labor Condition

Application ("LCA") for Nonimmigrant Workers (ETA Form 9035) to the Department of Labor ("DOL") in Chicago, Illinois. The purpose of the LCA is to ensure that the Petitioner has provided qualified American workers sufficient time and opportunity to apply for the proposed job by openly advertising the position. Once this obligation is met, the Petitioner can then submit the LCA electronically through the iCERT Portal system and will receive a courtesy e-mail, confirming receipt of the LCA submission.

9. The DOL then adjudicates the LCA and determines if the American company qualifies to hire foreign workers. If and when the application is approved, the DOL electronically notifies the Petitioner and DHS via e-mail. Once approved, all LCAs are required to be maintained on-site for inspection by immigration and law enforcement officials. Moreover, a copy of the LCA must be given to the H-1B worker no later than when he/she reports to work.

10. Based on my training and experience and from my review of emails belonging to Sunitha and Venkat GUNTIPALLY, petitioning companies typically save electronic copies of the LCA on their computers or other electronic storage devices and typically will email copies of the LCA and supporting documentation to their employees, government officials upon request, and other companies they are engaged in business with.

## C.    The I-129 Petition

11. After the LCA is approved, the Petitioner then prepares a Petition for a Nonimmigrant Worker ("I-129") for every foreign worker they wish to employ and submits the I-129 to a DHS processing center. The I-129 is a 35-page document that is publicly available in a fillable portable document format (PDF) on the U.S. Citizenship and Immigration Service (USCIS) website located at www.uscis.gov. This PDF enables the Petitioner to enter data directly onto the form and save it electronically on a computer or other electronic storage device for record

4

keeping and printing for submission to DHS. Among other things, the I-129 requires the name and biographical data of the proposed foreign worker, the proposed wage to be paid, and the address where the foreign worker will be working as well as biographical information about the Petitioner.

12. The I-129 requires the Petitioner to "certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct. If filing this on behalf of an organization, I certify that I am empowered to do so by that organization." In the accompanying instructions for the I-129, the Petitioner is advised that "[b]y signing this form, you have stated under penalty of perjury (28 U.S.C. § 1746) that all information and documentation submitted with this form is true and correct." The instructions also add that "[i]f you knowingly and willfully falsify or conceal a material fact or submit a false document with this petition … you will face severe penalties provided by law and may be subject to criminal prosecution." Thus, when a Petitioner signs the Form I-129, it assumes the legal responsibility for the truth and accuracy of all information submitted. If an I-129 is not signed, it will not be considered properly filed.

13. Petitioners have the option to e-file the I-129 to DHS and will receive a receipt indicating the service center to which the I-129 was routed. In the I-129, DHS reserves the right to verify any information submitted, including contact via written correspondence, telephone and "unannounced physical site inspections of residences and places of employment and interviews." When the I-129 is submitted to DHS, DHS reviews all of the listed and supplemental documentation and adjudicates it. If qualified, DHS approves H-1B visa/status to the proposed foreign worker and directs the worker to pick up his/her visa at an American Consulate or mails them the documentation if they are already in the United States.

**D.    End Client Worksites**

14. Some petitioners are in the business of obtaining H-1B visas for employees who will ultimately be placed with an end client that has the actual need for the employee. In pertinent part, should the petitioner, as an intermediary, wish to place its proposed foreign worker at an end client worksite, they can voluntarily submit their contracts, end client letters, or other documentation along with the I-129s to DHS.

15. Although supporting documentation is not required in the H-1B process, its absence will usually trigger USCIS to issue a Request for Evidence (RFE), which can significantly delay the adjudication process. RFEs occur when USCIS is unable to determine eligibility on the evidence provided. In order to avoid delays in processing, most Petitioners will submit as much supporting documentation as possible along with the I-129 H-1B petition.

16. Examples of supporting documentation from the petitioner include, in relevant part, (1) end client letters; (2) vendor letters; (3) purchase orders/contracts; and (4) company support letters to USCIS.

    a. <u>End client letters</u> are letters submitted by the ultimate client or a third-party worksite on behalf of the foreign worker and, in general, include the name of the foreign worker, his/her job title, the project(s) he/she is assigned to, the name of the foreign worker's onsite supervisor, and how long the foreign worker's services will be required.

    b. <u>Vendor letters</u> are letters submitted by companies that serve as middlemen between the Petitioner and end client on behalf of the foreign worker. Typically, Fortune 500 companies obtain foreign labor through vetted companies known as vendors. In turn, vendors will subcontract their client's requirements to petitioning companies. In general, vendor letters include the name of the foreign

worker, his/her job title, the project(s) he/she is assigned to, the name of the foreign worker's on-site supervisor, how long the foreign worker's services will be required and, in addition, describe the contractual relationship between the petitioner, vendor, and end client.

    c. <u>Purchase orders/contracts</u> between the Petitioner, vendor (if any), and end client are used to clarify and establish the business/contractual relationship(s) between the parties.

    d. <u>Company support letters</u> are written by the petitioning company to USCIS on behalf of the foreign worker and identify the foreign worker by name, job duties, education and skills, and establish the contractual relationship(s) between the end client, vendor and any subcontractors.

17. The validity date for a H-1B visa is generally determined by DHS based on the petitioner's alleged dates of employment for the foreign worker/beneficiary. The maximum initial period for a H-1B visa is three years at issuance, but can be extended for an additional three years for a total of six years. In the event that the beneficiary's employment concludes prior to the visa's expiration date, the visa can continue to be used by the beneficiary for subsequent employment, generally so long as notification of the change is made to DHS and DOL.

18. Even if the petitioner acts on behalf of an end client, unless and until the beneficiary's visa has expired or has been transferred to a new petitioning company, the petitioner is the formal employer of the beneficiary. While working at or for the end client, the employee is paid by the petitioner, and it is standard industry practice that the petitioner is paid an ongoing fee by the end client that covers the cost of the wage or salary as well as a markup for profit for the petitioner.

## IV.   COMMON H-1B VISA FRAUD SCHEMES

19. Based on my training and experience, I know that H-1B visa fraud schemes generally have recognizable patterns and particular purposes, including, among others:

   a. Fraudulent petitioners commonly conspire with others to invent end-client companies from whole cloth.  Investigations often reveal that the end client for which the beneficiary was petitioned to work does not actually exist:

   b. In some cases, the petitioners (and the preparers of the petitions) submit fraudulent materials in support of the petitions, including letters and contracts from the purported end client falsely claiming that the employer has a bona fide employment opportunity for the alien beneficiary;

   c. Sometimes members of the fraudulent petitioner's family pose as company owners, directors, and managers on signed supporting documentation submitted to the government: and,

   d. After the petition is approved, fraudulent petitioners profit from the scheme by having a "bench," a supply of qualified H-1B employees, with visas valid for the maximum term, ready to respond immediately to the market needs of actual end clients possessing actual employment offers, without the delays or limitations occasioned by the legal process for obtaining legitimate visas.

20. One of the **Subject Companies'** and **SISL Networks'** fraudulent schemes involves the placement of proposed foreign workers at end client worksites such as SemSolar, Inc., Traction HQ, Global ERP & RFID, SISL Networks, Kranem, Tunker USA and Technia Energy when in actuality these companies, hereinafter identified as **Subject End Clients**, do not exist and/or never received the proposed foreign worker.  Instead, once the H-1B visa is approved for the

worker, the **Subject Companies** and **SISL Networks** will locate actual employment for the Beneficiary.

## V.   APPLICABLE LAW

21. 18 U.S.C. § 1001 (False Statements) states, in part, that whoever in any matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully makes any materially false, fictitious, or fraudulent statement or representation; shall be fined and imprisoned for not more than five years. The Department of State is part of the executive branch of the United States Government.

22. 18 U.S.C. § 371 (Conspiracy) states, in part, that whoever agrees with one or more persons to commit another federal crime; shall be fined and imprisoned for not more than five years.

23. 18 U.S.C. § 1546 (Visa Fraud) states, in part, that whoever knowingly makes under oath, or as permitted under penalty of perjury knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact shall be fined under this title, imprisoned not more than 5 years, or both.

24. 18 U.S.C. § 1343 (Wire Fraud) states, in part, that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

25. 18 U.S.C. § 1956 (Money Laundering) states, in part, that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

## VI. FACTS ESTABLISHING PROBABLE CAUSE FOR COMPLAINT

**F.      End Client SemSolar, Inc.'s Alleged In-House Product "Eftia Master.Scribe"**

26. To date, 22 separate H-1B petitions filed by **Subject Companies** (specifically **Equinett** and **DS Soft Tech**) are for purported end client SemSolar, Inc. to allegedly work on an in-house, proprietary product named "Eftia™ Master.Scribe™". According to supporting documentation submitted by **Subject Companies** to DHS, including webpage information and slideshow attachments from SemSolar, Inc.'s website at www.semsolarinc.com; "Eftia™ Master.Scribe™" is a proprietary software product allegedly being developed in-house by Pratap "Bob" KONDAMOORI and his company SemSolar, Inc. In an October 16, 2013, voluntary, non-custodial interview Investigative Analyst (IA) Jessica Hubler and I conducted with KONDAMOORI, he repeated this claim, and stated that "Eftia Master.Scribe" provides "net metering" for facilities utilizing solar panels. KONDAMOORI also claimed to me during that interview that he would need approximately 45 H-1B workers to finish developing "Eftia Master.Scribe" but that none of the workers petitioned by **Subject Companies** had ever arrived.

27. On      October      1,      2013,      an      internet      search      at      http://www.eftia.com/ solutions/masterscribe/index.html by DHS fraud detection officers revealed the "Eftia

Master.Scribe™" Product Suite belongs to a company named OSS Solutions, Inc. based in Ottawa, Canada.

28. On March 12, 2014, using the search term "Eftia", I conducted an internet search of the U.S. Patent and Trademark Office website www.uspto.gov and confirmed that OSS Solutions, Inc. registered the trademark "Eftia™" on December 18, 1998.

29. On March 12, 2014, I contacted law firm Bordner Laedner Gervais, which formerly represented OSS Solutions, Inc. A representative of the law firm confirmed that it filed and received trademark registration of "Master.Scribe™" on September 8, 1998 and October 26, 1999, respectively, on behalf of its former client OSS Solutions. Per the law firm and my search of Canada's Patent and Trademark Office website www.cipo.gc.ca, "Eftia™ and Master.Scribe™" are registered to OSS Solutions and remain active until October 26, 2014.

30. From on or about May 30, 2012 to on or about April 8, 2013, under penalty of perjury, Sunitha GUNTIPALLY signed and submitted 22 separate I-129s and supporting documentation for individuals identified herein as R.R., M.C., T.K., P.A., A.A., D.M., S.K., A.A., M.A., B.K., R.P., B.V., R.B., S.K., M.B., J.K., N.J., P.B., R.K., M.S., R.N. and P.S. The supporting records included SemSolar, Inc. end client letters, contracts, and "Eftia Master.Scribe™" product slides attesting that the foreign workers were needed to work onsite at SemSolar, Inc.'s office, with a listed address of 842 Boggs Ave, Suite K2, Fremont, CA 94539 on the software product "Eftia Master.Scribe™". Twelve of the I-129s identified DS Soft Tech as the petitioner, and ten identified Equinett as the petitioner.

31. On October 29, 2013, IA Jessica Hubler and I conducted a voluntary, non-custodial interview of R.B., who had been petitioned by **Subject Companies** to work at **Subject End Client,** SemSolar, Inc. We advised her that she was out of legal immigration status and subject to

deportation.  R.B. confessed to IA Hubler and me that she had never heard of or worked at SemSolar, Inc. or heard of or worked on the product "Eftia Master.Scribe™".  R.B. further stated that since joining **Subject Companies**, she has been unemployed, waiting for GUNTIPALLY to locate for her an actual end client, despite having an approved H-1B visa to work at **Subject End Client,** SemSolar, Inc.

32. On November 4, 2013, R.B. agreed to conduct a series of consensually recorded telephone conversations between herself and Sunitha GUNTIPALLY.  Present during the calls was DHS Special Agent (SA) James Burke, IA Hubler, and I.  When R.B. called GUNTIPALLY to inform her that federal agents were attempting to interview her, GUNTIPALLY instructed her to tell the agents "I did not join the project because of my personal reasons" and "I am no longer with Equinett," which was untrue. In a subsequent recorded phone call, GUNTIPALLY instructed R.B. that she should claim that she was working at **Subject End Client** Traction HQ; that Traction HQ is located at 842 Boggs Avenue, Suite K1, Fremont, CA 94539; that Pavan RAVIPATI is her supervisor; that her project is called DreamBox; and that she was getting paid $62,000 per year; when in actuality none of this was true. As will be described in paragraph 42, in my interview of Traction HQ CEO Pavan RAVIPATI, RAVIPATI said none of **Subject Companies'** workers ever worked at **Subject End Client** Traction HQ.

33. On February 4, 2014, I conducted a voluntary, non-custodial interview of S.K., who had been petitioned by Sunitha GUNTIPALLY and Equinett to work at **Subject End Client** SemSolar, Inc.  According to S.K., Equinett had recently filed a visa amendment to reflect S.K.'s change in end clients from SemSolar to Cigna.  During my interview with S.K., she insisted that she worked at **Subject End Client** SemSolar prior to Cigna, despite the fact that during my October 16, 2013 interview of KONDAMOORI, as discussed in paragraph 26, he told me that none of

**Subject Companies'** workers had ever arrived to work at SemSolar. As already mentioned in paragraph 1(b), I executed a search warrant of **Subject Companies'** emails. In my review of those emails, I located an email dated December 2, 2013 from Operations Manager Anil Kumar at anil@dsssofttech.com to Venkat GUNTIPALLY and Sunitha GUNTIPALLY at venkat@dossofttech.com and sunitha@dssofttech.com, respectively. The email included a spreadsheet attachment labeled "Bench List", which contained the names of **Subject Companies'** H-1B workers that have yet to obtain real end clients. In my review of that spreadsheet, I located S.K.'s name indicating that she had been petitioned to work at **Subject End Client** SemSolar, but had yet to obtain a real end client.

34. From June 8, 2012 to November 5, 2013, DHS issued H-1B visas to R.R., M.C., T.K., P.A., D.M., S.K., A.A., M.A., B.K., R.P., B.V., R.B., S.K., M.B., J.K., R.K., and M.S. to work at **Subject End Client,** SemSolar, Inc.

**G.     End Client Traction HQ**

35. From on or about April 8, 2013 to on or about April 25, 2013, Sunitha GUNTIPALLY, under penalty of perjury, signed and submitted nine separate I-129s and supporting documentation for C.N., I.Q., K.M., M.P., M.K., N.G., N.S., S.P.N., and J.D. The records included Traction HQ end client letters and contracts attesting that the foreign workers were needed to work on-site at Traction HQ's office, with a listed address of 842 Boggs Ave, Suite K1, Fremont, CA 94539. Three of the I-129s listed DS Soft Tech as the petitioner, and six listed Equinett as the petitioner.

36. On October 16, 2013, IA Hubler and I conducted a site visit to Traction HQ's listed address and discovered a small, one-room office, which was also being utilized by **Subject End Client** SemSolar, Inc., and owned by Pratap "Bob" KONDAMOORI. As mentioned in paragraph 26, IA Hubler and I conducted a voluntary, non-custodial interview of SemSolar, Inc.'s CEO,

KONDAMOORI who informed us that he occasionally allowed some of Traction HQ's contractors to use SemSolar's office space.   KONDAMOORI informed us that Pavan RAVIPATI is the CEO of Traction HQ and I later learned that RAVIPATI is KONDAMOORI's nephew. IA Hubler and I did not observe any H-1B workers at the location for either SemSolar, Inc. or Traction HQ.

37. On February 4, 2014, DHS SA Burke and I conducted a voluntary, non-custodial interview of S.P.N., who had been petitioned by **Subject Company** Equinett on or about April 8, 2013 to work at **Subject End Client** Traction HQ.  We advised her that she was out of legal immigration status and subject to deportation.  During the interview, S.P.N. confessed to having never heard of, worked at or worked for Traction HQ.  Following the approval of her H-1B visa on August 22, 2013, S.P.N. remained in California, specifically living in Sunnyvale, County of Santa Clara, while GUNTIPALLY attempted to locate for her an actual end client.  S.P.N. stated that on or about November 1, 2013, GUNTIPALLY finally located for her actual employment as a Wireless Quality Assurance Engineer at Spirent Communications in New Jersey, through vendor Envisage, Inc., where she worked until December of 2013.

38. I submitted a search warrant application to U.S. Magistrate Howard R. Lloyd to search **Subject Companies'** iPage email accounts (sunitha@dssofttech.com, sr@dssofttech.com, sunitha@equinett.com, sr@equinett.com), which Judge Lloyd approved on May 2, 2014.  In my review of **Subject Companies'** emails, I located a contract for S.P.N. to work at end client Spirent through vendor Envisage dated October 11, 2013, and emails dated October 11-14, 2013 between Envisage CEO A.K. at akoul@envisageinc.com and GUNTIPALLY at sunitha@dssofttech.com confirming the contract for S.P.N. to work at Spirent through vendor Envisage.  I also located a spreadsheet containing **Subject Companies'** payroll for January

2014. In my review of the spreadsheet, I identified, among other things, the names of H-1B workers that were being "benched," including S.P.N. The emails and spreadsheet corroborate S.P.N.'s statements to me as described in paragraph 37 and demonstrate **Subject Companies'** pattern of petitioning for beneficiaries to work at fake end clients until real end clients can be obtained.

39. On February 10, 2014, S.P.N. informed me that Sunitha GUNTIPALLY ordered her and another **Subject Company** H-1B worker to report to Traction HQ's listed address every day between the hours of 9:00AM and 5:00PM in the event that government agents were to conduct an unannounced site visit. S.P.N. informed me that since no actual work existed at Traction HQ, she spent the time preparing herself for interviews with real end clients.

40. On February 14, 2014, S.P.N. briefed me about her week at Traction HQ. S.P.N. stated that both Sunitha GUNTIPALLY and RAMIREDDI appeared at Traction HQ at various times during the week and that both instructed her to tell agents that they were working on a Traction HQ software project named DreamBox, even though no such work existed.

41. As will be discussed in paragraph 51, during the March 26, 2014 interview of RAMIREDDI, she admitted that none of **Subject Companies'** H-1B foreign workers had ever worked at or for Traction HQ. During that same interview, RAMIREDDI also admitted that none of **Subject Companies'** H-1B foreign workers had ever worked at **Subject End Client** companies Technia Energy, Tunker USA, or Global ERP & RFID. RAMIREDDI also stated that she was aware of H-1B fraud perpetrated by the GUNTIPALLYS, specifically Sunitha, but claimed she did not directly engage in the fraud itself and limited her duties to administrative work such as the collecting of H-1B documents from the prospective beneficiaries, timesheets, and the liaison with the companies' immigration attorney.

42. On June 17, 2014, DHS SA Duncan Nolasco and I conducted a voluntary, non-custodial interview of Pavan RAVIPATI, CEO of Traction HQ. In that interview, RAVIPATI admitted to SA Nolasco and I that none of the workers petitioned by **Subject Companies** ever worked at Traction HQ. RAVIPATI also stated that it was his uncle, KONDAMOORI, who first approached and convinced him to sign Traction HQ contracts and end client letters for **Subject Companies'** foreign workers and that he recalls personally signing approximately ten sets of the documents, which KONDAMOORI brought to him.

43. When I informed RAVIPATI that DHS records showed that **Subject Companies** had petitioned for more than ten beneficiaries to work at Traction HQ, RAVIPATI explained that on/about April of 2014, he was summoned by Venkat GUNTIPALLY, Sunitha GUNTIPALLY and KONDAMOORI to a meeting at **Subject Companies'** offices, at which time he discovered that his signature had been forged on at least eight more sets of documents submitted for **Subject Companies'** workers' visa petitions, namely: K.M., S.T., S.A., I.G., I.Q., N.C., N.S., and M.M. When RAVIPATI confronted the group about the forged signatures, he recalled KONDAMOORI saying "we" forged your signature because "we" did not want to bother you. RAVIPATI also told me that during the meeting, the GUNTIPALLYs and KONDAMOORI provided him with the names and photographs of **Subject Companies'** workers that were supposed to be working at Traction HQ and instructed him to memorize those names and faces. The GUNTIPALLYs and KONDAMOORI warned RAVIPATI that he would probable receive a visit from agents and that he should be prepared to lie by corroborating that the eight aforementioned workers were working at Traction HQ when in actuality they were not.

44. Sunitha GUNTIPALLY, Venkat GUNTIPALLY, and KONDAMOORI also provided RAVIPATI with copies of Traction HQ contracts, end client letters, and passport biographic

pages for the eight aforementioned **Subject Companies'** workers to use as proof to agents that the foreign workers were Traction HQ employees. RAVIPATI voluntarily provided me consent to view and take possession of the above mentioned documents, which I did.

45. In my review of the documents voluntarily provided to me by RAVIPATI, I discovered copies of three certified check receipts from Chase Bank all dated April 5, 2014. The first check receipt was from RAVIPATI to Equinett in the amount of $15,000 and the remaining two receipts were from RAVIPATI to DS Soft Tech in the amounts of $8,000 and $7,000 for a total of $30,000. RAVIPATI explained to me that Venkat GUNTIPALLY had wired a total of $30,000 into RAVIPATI's personal Chase Bank account ending in 6574 and then instructed him to write two checks, one to DS Soft Tech and one to Equinett, in the amounts of $15,000 each to make it appear that **Subject Companies** and **Subject End Client** Traction HQ were engaged in business transactions when in actuality no such legitimate transactions had occurred. On the memo line of each check, RAVIPATI was instructed by Venkat GUNTIPALLY to write "invoice payments." When I asked RAVIPATI if business transactions had actually transpired between **Subject Companies** and Traction HQ, RAVIPATI stated no.

46. On June 26, 2014, I served grand jury subpoenas for records relating to **Subject Companies'** bank accounts as well as RAVIPATI's Chase Bank Account. On August 26, 2014, DS Asset Forfeiture Specialist John Cornish reviewed the results of those subpoenas. On this date, Cornish informed me that he located two April 7, 2014 deposits of $7,000 and $8,000 from Traction HQ showing both to be "payments for invoice" to DS Soft Tech's corporate account and one April 7, 2014 deposit of $15,000 from Traction HQ showing "payments for invoice" to Equinett's corporate account.

47. On July 30, 2014, I asked **Subject Companies'** immigration attorney Gautam Dutta to provide proof that **Subject Companies** was conducting business with **Subject End Clients**.   On August 12, 2014, **Subject Companies,** through Dutta, provided me with invoices and check copies matching those described in Paragraph 45 pertaining to Traction HQ as well as check copies from **Subject End Clients** SemSolar, Tunker USA, and SISL Networks.   Based on the investigation to date, I have determined that Venkat GUNTIPALLY transferred money from bank accounts belonging to **Subject Companies** to the aforementioned **Subject End Client** Traction HQ and back again in order to deceive DHS into believing that business was being conducted between the two companies when in actuality it was not.

48. During my review of **Subject Companies'** external hard drive belonging to KONDAMOORI, I found an electronic file in PDF format of a contract between Traction HQ and Equinett by Sunitha GUNTIPALLY and Pavan RAVIPATI, signed March 12, 2013 and March 13, 2013, respectively.   When I compared the signatures and dates on that contract with the ones provided to me by RAVIPATI as described in Paragraph 44, I noticed that they appeared to be identical to those in the eight contracts already referred to in paragraph 43, corroborating RAVIPATI's statements to me.

49. Based on my review of **Subject Companies'** emails, I found an email dated November 23, 2013 from Sunitha GUNTIPALLY at sunitha@dssofttech.com to M.V. at Mahesh@s3infotech.com of S3Infotech with the Subject Line "FW: [N.G.'s name] (High Important.)".   N.G. had been petitioned by Equinett to work at **Subject End Client** Traction HQ.   In that email, Sunitha GUNITPALLY urges M.V. to rush the H-1B visa amendment for N.G. stating, "DHS Deportment vising all the client and Home Address. Please we need to done the all the H1B amendments."   In my review of **Subject Companies'** laptop, I located an October 10, 2013

contract and end client letter to place N.G. at end client Edward Jones via vendor S3Infotech. Based on my training and experience, interviews of RAVAPATI and other **Subject Companies'** workers, and the fact that N.G. had been petitioned to work at **Subject End Client** Traction HQ when no offer of employment actually existed, I know that GUNTIPALLY would have wanted to execute visa and LCA amendments as soon as possible from fake end clients to real ones.

50. From May 6, 2013 to November 25, 2013, DHS issued H-1B visas to C.N., I.Q., K.M., M.P., M.K., N.G., S.P.N., and J.D. to work at **Subject End Client** Traction HQ.

**H.    Subject Companies' and Subject End Clients' Laptop and External Hard Drive**

51. On March 25, 2014, Investigative Research Specialist (IRS) Mike Acevedo and I conducted a custodial interview of Sandhya RAMIREDDI, former **Subject Companies'** Human Resources and HR/Chief Operations Officer. After waiving her Miranda Rights, RAMIREDDI agreed to speak with IRS Acevedo and myself. At the time of the interview, RAMIREDDI confirmed that she is also employed as the Director of Operations for **Subject End Client** companies SemSolar, Inc. and SISL Networks, which are both owned by her brother, KONDAMOORI. RAMIREDDI informed IRS Acevedo and me that in her possession and control were a laptop and hard drive, over which she maintained authority; that the former had been used by her in the course of her work at **Subject Companies**; and that the latter had been used by KONDAMOORI, who told her that it contained important documents concerning his work at **Subject End Clients** and **Subject Companies.**

52. I submitted applications to search the aforementioned laptop and hard drive to U.S. Magistrate Howard R. Lloyd. On May 2, 2014, Judge Lloyd approved the application and issued search warrants for both items.

53. From May 2, 2014 to present, I reviewed the contents of the laptop and hard drive. Among other things, I found an email on RAMIREDDI's laptop dated February 13, 2014 from KONDAMOORI at bkondamoori@gmail.com to RAMIREDDI at sandhyaramireddi10 @gmail.com with the subject heading "Fake Timesheets". In addition, I also located, in both the laptop and hard drive, attachments and documents purporting to be timesheets for **Subject Companies'** workers from **Subject End Clients.** Based on my training and experience, I know it likely that KONDAMOORI provided RAMIREDDI with fabricated timesheets for alleged H-1B workers assigned to work at **Subject End Clients** SemSolar, Inc. and Traction HQ in the event **Subject Companies** were to be audited by law enforcement and immigration officials.

**I.      End Client SISL Networks**

54. From on or about April 17, 2012 to on or about June 4, 2012, Sunitha GUNTIPALLY, under penalty of perjury, signed and submitted 20 separate I-129s and supporting documentation for S.S., S.P., S.B., A.K., H.J., M.J., N.T., R.G., S.K., S.N., A.M., V.K., N.B., L.M., M.T., M.D., S.A., K.T., M.G., and P.B.  The records included SISL Networks end client letters and contracts attesting that the foreign workers were needed to work onsite at SISL Networks' office, with a listed address of 560 S. Winchester Blvd, Suite 500, San Jose, CA 95128. Fifteen of the I-129s identified DS Soft Tech as the petitioner; five identified Equinett as the petitioner.

55. As already mentioned in paragraph 26, IA Hubler and I conducted a voluntary, non-custodial interview of KONDAMOORI at SemSolar, Inc.'s office.    During that interview, KONDAMOORI claimed to IA Hubler and I that he served as SISL Networks' Registered Agent, which I later learned to be false.  According to commercial record checks, RAMIREDDI is the company's Registered Agent; SISL Networks was previously named "Kondamoori Technologies, Inc."; and KONDAMOORI serves as a company officer at SISL Networks.

Moreover, based on supporting documentation submitted for N.T.'s H-1B visa, KONDAMOORI lists himself as SISL Network's Chairman.

56. During the aforementioned interview of KONDAMOORI, KONDAMOORI claimed to IA Hubler and me that SISL Networks develops remote telecom towers based on solar energy. He further stated that Softbank, the company that recently acquired Sprint, had invested in SISL Networks and requested SISL Networks to build remote telecom towers in order to provide better cell phone reception for Sprint customers.

57. On October 21, 2013, I spoke with Softbank Vice-President J.L. to confirm KONDAMOORI's claim regarding Sprint's business relationship with SISL Networks. J.L. informed me that he has worked at Softbank for 14 years and is familiar with all of its U.S. operations and has never heard of SISL Networks or KONDAMOORI and that Softbank has never conducted business with either.

58. On October 29, 2013, I spoke with Sprint's Corporate Security Manager R.S. to confirm KONDAMOORI's claim regarding Sprint's business relationship with SISL Networks. R.S. informed me that Sprint has never acquired, invested in, or conducted business with SISL Networks, Inc.

59. On April 25, 2014, DHS SA Nolasco and I conducted a voluntary, non-custodial interview of M.D., who had been petitioned by Equinett to work at **Subject End Client,** SISL Networks. M.D. stated that she first heard about **Subject Companies** through a friend that had been petitioned by them. However, while being petitioned by Equinett, and after obtaining her H-1B visa to work at **Subject End Client,** SISL Networks, M.D. resigned from her position with Equinett when Sunitha GUNTIPALLY told her that (a) she would need to locate her own end client since no actual job existed at SISL Networks; (b) pay approximately $5,000 for **Subject**

**Companies** to petition for her visa (which is a violation of DHS policy); and (c) lie on her resume by claiming two years of related work experience when, in actuality, M.D. had none. Sunitha GUNTIPALLY assured M.D. that **Subject Companies** had contacts in actual Fortune 500 end clients, specifically mentioning Cisco, that were willing to serve as fake job references on behalf of **Subject Companies** employees in return for money.

60. M.D. informed me that on September 11, 2012 she recorded and saved conversations between her, Sunitha GUNTIPALLY and RAMIREDDI, which corroborate some of the information already described in paragraph 59.  During the interview, M.D. played the recordings to SA Nolasco and me and forwarded them to me via email.

61. From April 4, 2012 to January 2, 2013, DHS issued H-1B visas to S.S., S.P., S.B., A.K., H.J., M.J., N.T., R.G., S.K., S.N., A.M., V.K., N.B., L.M., M.T., M.D., S.A., and P.B. to work at **Subject End Client** SISL Networks.

**J.    End Client Technia Energy**

62. From on or about June 5, 2012 to on or about April 8, 2013, Sunitha GUNTIPALLY, under penalty of perjury, signed and submitted 24 separate I-129s and supporting documentation for S.B., N.T., S.K., F.M., E.P., R.S., T.G., V.K., I.P., N.M., R.M., C.K., S.N., B.E., A.V., A.S., B.S., U.G., J.A., C.K., I.G., K.N., J.C., and A.M.  The records included Technia Energy end client letters and contracts attesting that the foreign workers were needed to work onsite at Technia Energy's office with a listed address of 8745, Suite D Technology Way, Reno, NV 89451.  Sixteen of the I-129s identified DS Soft Tech as the petitioner; eight identified Equinett as the petitioner.

63. On June 11, 2013, DHS officers conducted a site visit of Technia Energy's office at the listed address and, upon arrival, noted the interior of Suite D to be vacant and having no signage on the

22

door indicating the presence of Technia Energy.  Interviews of adjacent tenants in Suites C and E, both of whom have been at the location since 2012 and 2006, respectively, informed the officers that neither had ever heard of Technia Energy.  The building's President, who occupies Suite L, also informed the officers that he has never heard of Technia Energy and that the former tenant of Suite D, "LV Ring," was forced to vacate due to non-payment of rent.

64. On March 13, 2014, I conducted a WHOIS search through Network Solutions for the domain name www.techniaenergy.com and found that webhost Go Daddy lists the registrant as Anders O. FIELD and the administrator as Pratap KONDAMOORI, both with a listed address of P.O. Box 4184, Incline Village, NV 89450.  A review of the end client letters and contracts submitted for **Subject Companies'** 17 aforementioned H-1B foreign workers are signed by Anders O. FIELD, who lists himself as Technia Energy's Chairman.  In the end client letters, FIELD claims that **Subject Companies'** foreign workers are needed to work on-site at Technia Energy's listed address in Reno, NV, set forth above.

65. On October 30, 2013, IA Hubler and I attempted to conduct an interview of A.M. at his place of residence but learned from A.M.'s roommate that he was working at the anti-virus software company, McAfee.  IA Hubler and I immediately proceeded to McAfee but upon arrival learned that A.M. had suddenly, and without explanation or notice to his McAfee supervisor, departed McAfee approximately 15-30 minutes prior.  McAfee personnel and I made multiple attempts to contact A.M. on his cell phone without success.  On this same date, at approximately 5:00PM, A.M. contacted me via phone and attributed his sudden departure from McAfee to "loose bowels" and wanting to reschedule the interview for the following day.

66. On October 31, 2013, IA Hubler and I conducted a pre-scheduled, voluntary, non-custodial interview of A.M..  We advised him that he was out of legal immigration status and subject to

deportation. A.M. admitted to me that, once he learned that agents wanted to interview him, he contacted Sunitha GUNTIPALLY for instructions. During the interview, A.M. insisted to IA Hubler and me that (a) he worked onsite at Technia Energy's listed address of 8745 Technology Way, Reno NV, 89451 for two months from approximately June 20, 2013 to August of 2013; (b) during that time, he lived in an apartment with two other Technia employees; and (c) Technia Energy employed 400 hardware engineers at this location. However, A.M. was unable to provide me with the address in Nevada where he lived or the names of the two roommates he claimed to have lived with for two months. A.M. also informed me that after working at Technia Energy, Sunitha GUNTIPALLY found him employment with end client Tesla, located in Palo Alto, CA.

67. On December 11, 2013, Tesla confirmed for me that A.M. had worked there from September 17, 2013 to October 18, 2013, which is a violation of his H-1B visa since he had been petitioned to only work at **Subject End Client** Technia Energy during this time period.

68. On October 31, 2013, after my interview of A.M., I received a call from Gautam Dutta, one of the immigration attorneys claiming to represent **Subject Companies.** I requested from Dutta proof that A.M. worked on-site at Technia as was claimed by A.M. and as represented on A.M.'s visa petition and labor certification (LCA). On November 14, 2013, after consulting with **Subject Companies,** Dutta emailed me stating that A.M. never worked on-site at Technia Energy, but instead worked remotely from California, which is also a violation of A.M.'s H-1B visa and inconsistent with his previous claims to me of having worked in Reno.

69. From June 19, 2012 to July 30, 2013, DHS issued H-1B visas to S.B., S.K., F.M., E.P., R.S., T.G., V.K., I.P., N.M., R.M., S.N., B.E., A.V., A.S., B.S., U.G., J.A., and A.M. to work at **Subject End Client** Technia Energy.

**K.     End Client Global ERP & RFID**

70. From on or about January 27, 2010 to on or about May 10, 2012, Sunitha GUNTIPALLY, under

    penalty of perjury and through petitioner DS Soft Tech, signed and submitted 26 separate I-129s

    and supporting documentation for R.M., P.M., L.U., K.V., R.M., N.A., K.K., N.D., M.K., N.D.,

    S.J., V.K., G.P., A.V., T.A., R.M., P.R., S.A., R.S.R., R.A., D.M., S.M., A.S., N.S., S.K. and

    A.P.  The records included Global ERP & RFID end client letters and contracts attesting that the

    foreign workers were needed to work onsite at Global ERP & RFID's office, with a listed

    address of 244 5th Ave, N259, New York, NY, 10001.  An internet search of the company's

    website, www.globalerprfid.com, also shows the same New York address.

71. On January 16, 2014, DHS officers conducted a site visit to Global ERP & RFID's listed address

    and discovered that the company does not exist.  The location is in actuality a commercial high-

    rise building belonging to AEROBEEP NYMAIL NYC VIRTUAL OFFICE.  Upon inquiry, the

    office manager informed the DHS officers that he previously handled mail and voicemail

    services for Global ERP & RFID, but that the company has never occupied or utilized any space

    in the building.

72. On February 4, 2014, DHS SA Jim Burke and I conducted a voluntary, non-custodial interview

    of P.M. who had been petitioned by DS Soft Tech to work at **Subject End Client** Global ERP &

    RFID.    We advised him that he was out of legal immigration status and subject to deportation.

    P.M. confessed to having never worked at or for Global ERP & RFID.  Following the approval

    of his H-1B visa on July 12, 2011, P.M. resided in California, specifically in Santa Clara, (with a

    temporary return to India due to the death of his mother), while GUNTIPALLY attempted to

    locate him an actual end client.  P.M. stated that in July of 2013, GUNTIPALLY finally located

him actual employment as a Computer Programmer with end client Synopsys, located in Santa Clara County, where he worked until August of 2013.

73. On February 12, 2014, DHS SA Duncan Nolasco and I conducted a voluntary, non-custodial interview of K.V. who had been petitioned by DS Soft Tech to work at **Subject End Client**, Global ERP & RFID.  We advised him that he was out of legal immigration status and subject to deportation.  K.V. confessed to having never worked at or for Global ERP & RFID and admitted that from October to December of 2011, following the approval of his H-1B visa on October 27, 2011, he remained in California while GUNTIPALLY attempted to locate him an actual end client.   K.V. stated that in January of 2012, GUNTIPALLY finally located him actual employment as a Computer Programmer with end client NetApp, located at 495 E. Java Dr., Sunnyvale, CA, which is where I found him working.

74. From May 24, 2010 to December 18, 2012, DHS issued H-1B visas to R.M., P.M., L.U., K.V., R.M., N.A., K.K., N.D., M.K., N.D., S.J., V.K., G.P., A.V., T.A., R.M., P.R., S.A., R.S.R., R.A., D.M., S.M., A.S., S.K. and A.P. to work at **Subject End Client** Global ERP & RFID.

**L.     End Clients Kranem & Verseon/Petitioner SISL Network**

75. On or about April 8, 2013, Pratap KONDAMOORI, under penalty of perjury, and through petitioner **SISL Networks, Inc.**, signed and submitted eight separate I-129s and supporting documentation for T.H., H.K., F.S., S.S., R.M., V.S., A.S., and S.H.  The records included Kranem vendor letters, contracts and letters to DHS attesting that the foreign workers were needed to either work onsite at end client Verseon's office, with a listed address of 48820 Kato Rd., Suite 100B, Fremont, CA 94538; or on-site at Kranem's office with a listed address of 560 Winchester Blvd. Rm.1, San Jose, CA 95128 on Verseon's "Wellcom Health Big Data Project" or at Kranem as a computer programmer, respectively.

76. On February 12, 2014, SA Nolasco and I conducted a site visit to Verseon's listed address and spoke with the company's Director of Discovery Planning, K.S. and Verseon Administrative Assistant, A.T. Both K.S. and A.T. stated that neither has ever heard of the company Kranem or SISL Networks, Inc. and that they both are unaware of any contracts between Verseon and Kranem or **SISL Networks, Inc.** for H-1B foreign workers.

77. On February 19, 2014, I received a call from Verseon's CEO and founder, A.P. A.P. informed me that Verseon does not have a contract with Kranem or **SISL Networks, Inc.** for H-1B foreign workers, but that he did meet Kranem's President, Ajay Bathejay, through his long-time friend KONDAMOORI. A.P. further stated that he and Bathejay did discuss the possibility of obtaining H-1B foreign workers through Kranem and KONDAMOORI's company **SISL Networks, Inc.** but that no contract or formal agreement had ever been signed and no employees had been thus obtained.

78. From August 30, 2013 to October 28, 2013, DHS issued H-1B visas to H.K. and S.S. to work at end client Verseon through vendor Kranem. From August 28, 2012 to November 6, 2013, DHS issued H-1B visa to T.H., V.S., and A.S. to work at end client Kranem.

79. On or about April 8, 2013, Sunitha GUNTIPALLY, under penalty of perjury, signed and submitted 18 separate I-129s and supporting documentation for P.G., S.B., R.B., K.Y., R.A., D.B., S.S., S.N., S.C., N.K., R.D., S.G., R.M., S.M.K., K.V., S.V., S.K. and L.G. The records included end client letters and contracts attesting that the foreign workers were needed to work on site at Kranem's office, with a listed address of 560 Winchester Blvd. Suite 500, San Jose, CA 95128. Twelve of these I-129s identify Equinett as the petitioner; six identify DS Soft Tech.

80. On February 21, 2014, Immigration Officer Ana Madrigal and I conducted a voluntary, non-custodial interview of Kranem's Vice-President, Luigi Caramico. When shown the Kranem

vendor letters and contracts submitted by KONDAMOORI and Sunitha GUNTIPALLY to DHS as supporting documents for H-1B visa petitions, Caramico admitted to signing them but never scrutinizing their contents, explaining that he trusted his long-time friend KONDAMOORI, who had brought a stack of the documents over to his house to sign. Caramico further stated that he first met GUNTIPALLY through KONDAMOORI and agreed to engage with her in contracts with **Subject Companies** for H-1B workers but that he had no knowledge of any agreement being signed between Kranem and Verseon. When asked if Kranem had ever received any workers from **Subject Companies** and if the company still needed **Subject Companies'** workers, Caramico stated no to both questions, explaining that Kranem had filed for bankruptcy on/about November 25, 2013. Caramico also informed IA Madrigal and me that he informed KONDAMOORI about the bankruptcy filing and no longer needing **Subject Companies'** workers approximately one week after the filing. Moreover, per a letter KONDAMOORI wrote to USCIS dated May 13, 2014 found in S.K.'s amended H-1B visa petition, KONDAMOORI admits to knowing about Kranem's bankruptcy filing one week after November 25, 2013.

81. In my review of KONDAMOORI's external hard drive, I located an email dated January 17, 2014 from RAMIREDDI at sr@dssofttech.com to Venkat GUNTIPALLY at venkat@dssofttech.com with the subject line "List of Students who are not in project." In that email, RAMIREDDI provided Venkat GUNTIPALLY with a spreadsheet of **Subject Companies'** workers and the names of the **Subject End Clients** they were petitioned to work at, including L.G., which shows her to have an approved H-1B visa for Kranem. I also located Kranem timesheets for **Subject Companies'** worker, L.G. alleging that she worked at Kranem as a Programmer Analyst under Executive Vice-President Luigi Caramico from November 18, 2013 to January 24, 2013 for approximately 40 hours per week. I know from my training and

experience, interview with Caramico, and the investigation to date, that the Kranem timesheets found on KONDAMOORI's external hard drive are fabricated and would most likely be used by **Subject Companies** and **Subject End Clients** as supporting documentation for L.G.'s alleged employment in the event an audit was conducted by law enforcement or immigration officials.

82. Based on my review of **Subject Companies'** emails, I located a December 12, 2013 email from N.K. at nayanuvkr@gmail.com to Sunitha GUNTIPALLY at sunitha@equinett.com.  Carbon copied on that email was Sandhya RAMIREDDI at sr@dssofttech.com.  In that email exchange, N.K. stated that since Sunitha GUNTIPALLY admitted to him that no actual employment existed at **Subject End Client** Kranem, he was not willing to relocate to California.  N.K. also stated to GUNTIPALLY that he wants a refund of $5,500, which he paid her to process his H-1B visa; and that GUNTIPALLY needs to pay him since according to Department of Labor regulations, "benched" employees should be receiving a salary. On December 14, 2013, Sunitha GUNTIPALLY responded to N.K. by ordering him to report to Kranem manager Luigi Caramico at **Subject End Client**, Kranem, located at 560 South Winchester Boulevard, Suite 500, San Jose, CA.  However, as already mentioned in paragraph 80, as of November 25, 2013, Kranem was no longer in need of H-1B workers due to its bankruptcy filing.

83. On February 21, 2014, IO Madrigal and I conducted a voluntary, non-custodial interview of S.K. at her work location, Infovity.  We advised her that she was out of legal immigration status and subject to deportation.   S.K. confessed that (a) she never worked at or for Kranem; (b) she never met her alleged supervisor, Luigi Caramico; and (c) she paid $5,400 for her visa, which is a violation of DHS regulations.  S.K. told IO Madrigal and I that when she expressed concern to GUNTIPALLY about not actually working at Kranem, GUNTIPALLY instructed her to lie to agents if questioned by claiming that she worked on-site at Kranem's office approximately 2-3

times per week.  Following approval of her H-1B visa, S.K. remained in California, specifically

living in Sunnyvale, County of Santa Clara, while GUNTIPALLY attempted to locate for her an

actual end client.  S.K. stated that on or about October 24, 2013, GUNTIPALLY finally located

her actual employment as a Computer Programmer with end client Infovity.

84. From May 3, 2013 to November 6, 2013 DHS issued H-1B visas to P.G., S.B., R.B., K.Y., R.A.,

D.B., S.S., S.N., S.C., N.K., R.D., S.G., R.M., and L.G. to work at **Subject End Client** Kranem.

**M.     Further Evidence of Conspiracy between Subject Companies and Subject End**

**Clients**

85. As already mentioned in paragraph 38, in my review of **Subject Companies' emails,** I also

located an email dated October 9, 2013 from KONDAMOORI at bkondamoori@gmail.com to

RAMIREDDI at sandhyaramireddi10@gmail.com, which was forwarded on this same date to

Sunitha   GUNTIPALLY   at   sunitha@dssoftech.com   and   Venkat   GUNTIPALLY   at

venkat@dssoftech.com by RAMIREDDI at sandhyaramireddi10@gmail.com.  This email reads,

in part, as follows:

> Regarding the email IDs that need to be created, I did not know this was part of
> the contract. I knew I had to support USCIS queries but not email ID's.
>
> *          *          *
>
> . . . . Kranem is NOT willing to give any email ID's to anyone. So I have decided
> to set up a new domain called Kranem.net and set up email ID's.  And In case
> someone goes to www.Kranem.net, it will get redirected to Kranem.com.
>
> *          *          *
>
> Is it OK if we keep these email ID's for one year and we cancel them later?
>
> *          *          *
>
> . . . . I did not expect so much work but I committed to supporting to Venkat and
> Sunitha.  So I will do it with project plans, maintain offices, running payroll in
> two of these companies, paying taxes for payroll, etc. And after sharing with the

$1750 with Kranem and Jaiom, and paying for project reports and the time is is consuming and the risk associated with all this, I am running negative on funds.

86. On November 4, 2013 RAMIREDDI sent an email entitled "Re: Richard from USCIS" stating, in part:

> Bobby:
> Richard was here when I came to boggs. He was just leaving when I entered Semsolar. On seeing me he came back and wanted to know who I am. He also checked my id and green card and made a note and also found out what my designation was in SISL and SemSolar. He also asked me if I am working at DS Soft.

Venkat GUNTIPALLY replied to RAMIREDDI, Sunitha GUNTIPALLY, and KONDAMOORI, stating:

> What was your answer when he asked about Are you working ad DS Soft?
> If he asks us, we need to answer the same to be on the same page.

87. Based on my investigation to date, interviews of **Subject Companies** workers, and interviews of Kranem Vice-President, Caramico and Traction HQ CEO RAVIPATI, I believe that the above referenced email demonstrates how KONDAMOORI and Venkat and Sunitha GUNTIPALLY have conspired to create fake email accounts and fraudulent supporting documents for **Subject End Clients** SemSolar, Kranem and Traction HQ to be used in the event of an audit by immigration or law enforcement officials, and to otherwise obstruct the federal investigation of their activities.

## VII. SEALING REQUEST

88. I respectfully request that this Affidavit in support of a complaint and arrest warrants be sealed until the execution of the search warrant. Disclosure of these documents at this time would seriously jeopardize the ongoing investigation as the targets would not otherwise be aware of this warrant or that their activities are necessarily the subject of an ongoing criminal investigation. Disclosure at this time would provide the target with the opportunity to destroy evidence, change

patterns of behavior, notify other confederates, or allow confederates to flee. Further, the investigation in this matter is continuing, and disclosing the contents of the Affidavit prior to execution will likely preclude or impede the agents and investigators working on this matter from investigating new criminal activity or leads.

## VIII. CONCLUSION

89. Based on the foregoing, there is probable cause to believe that Venkat GUNTIPALLY ("Venkat"), Sunitha GUNTIPALLY ("Sunitha"), Sandhya RAMIREDDI ("RAMIREDDI"), and Pratap KONDAMOORI committed the offense described in the complaint.


_____ _____
Richard Lin
Special Agent
Diplomatic Security Service
U.S. Department of State
San Francisco Field Office


SUBSCRIBED AND SWORN BEFORE ME
On October _____ , 2014


_____
The Honorable Howard R. Lloyd
U.S. Magistrate Judge
Northern District of California

**CRIMINAL PENALTIES**

<u>United States v. SUNITHA GUNTIPALLY, VENKAT GUNTIPALLY, PRATAP "BOB"
KONDAMOORI, and SANDHYA RAMIREDDI</u>

Title 18, United States Code, Section 371:

| | |
|---|---|
| Maximum term of imprisonment: | Five years |
| Maximum fine: | $250,000 or twice the gross gain or loss, whichever is greatest |
| Maximum term of supervised release: | Three years |
| Restitution: | Mandatory; amount to be determined |
| Special assessment: | $100 |

*[Handwritten note: Conspire commit visa fraud — re: I-129 petitions & support docuits non-immigrant worker applicants had job offer Am. eevs — not true specifically cite me example "S.R.N." Traction HQ.]*